IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DANIEL PONEMAN, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 13 CV 8809 ) ) Hon. Charles R. Norgle |
| NIKE, INC., et al., | ) ) |
| Defendants. | ) ) |

**OPINION AND ORDER**

Daniel Poneman ("Plaintiff") brings suit against Nike, Inc. ("Nike"), and Footlocker, Inc. ("Foot Locker"), (collectively "Defendants") for trademark infringement related to his "SwagAir" mark pursuant to 15 U.S.C. § 1121. Plaintiff also asserts common law trademark infringement and claims under the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/1 *et seq.*, and The Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 505/1 *et seq.* Before the Court is Defendants' motion for summary judgment. For the following reasons, the motion is granted.

**I. BACKGROUND**[1]

In 2006, while still a high school student himself, Plaintiff began scouting high school basketball players for collegiate programs. Plaintiff continued his activities through high school until, in his senior year, he left school to pursue his career full time. From 2006 until 2010 Plaintiff conducted his online operations through IllinoisHSbasketball.com and DPBball.blogspot.com. In March 2010, Plaintiff sought to rebrand himself, in order to remove limits imposed by such specific and regional names. Plaintiff was looking for a moniker that would allow him to expand into other areas such as national scouting, scouting for other sports,

---

[1] The Court takes the undisputed facts from the parties' Local Rule 56.1 statements.

1

music management, apparel production, et cetera. Eventually Plaintiff settled on the name "SwagAir" meant to be a play on the word "swag," a term only "the cool kids were using" and "swagger." Defs.' Reply Mem. Supp. Mot. Summ. J., Ex. 1, Dep. Daniel Poneman, pp. 101:12-103:3. At no time did Plaintiff register the name "SwagAir" with the U.S. Patent and Trademark Office, or any other office.

Plaintiff began using his new name in conjunction with his scouting activities and to brand many of his 539 YouTube videos. On March 28, 2010, Plaintiff held the first of his basketball showcases and called the event the "SwagAir Showcase," over one year later Plaintiff held his second showcase, again calling it "SwagAir Showcase." Def.'s Mot. Summ. J. Pl.'s Claims, Ex. A 4, p. 9. At the showcases Plaintiff sold each player-participant a t-shirt, the cost of which was included in their registration fee, and also offered the same t-shirts for sale to those in attendance. Over the course of both showcases, Plaintiff distributed 296 t-shirts in total.

However, Plaintiff's scouting business was not blooming as he had hoped. In an effort to expand his business and brand nationally, he began producing a documentary film chronicling the struggle of several high school basketball players. Beginning in 2012 and for the three years following, Plaintiff took a step back from producing YouTube videos and hosting basketball showcases. While he retained the moniker SwagAir as his social media handle, the name does not appear on any other materials, such as promotional material for the film, from 2012-2014.

In August 2012, Foot Locker representatives approached Nike and requested that they design and produce a t-shirt that included the word "swag." Nike designers immediately began experimenting with designs and slogans, eventually settling on SWAG AIR in the traditional Nike font. During the course of the design process Nike completed a trademark search for "swag air" and its variations; because Plaintiff's mark was never registered, it did not appear. Nike also reviewed the results of internet searches and discovered only Plaintiff's social media presence. By

2

March 2013, Nike had produced the t-shirt in question and began selling them in Nike retail stores, Foot Locker stores, Foot Locker's affiliated stores, and online.

On December 10, 2013, Plaintiff filed a complaint, alleging that Defendants are liable for trademark infringement under 15 U.S.C. § 1125(a). The Court has original jurisdiction pursuant to 15 U.S.C. § 1121. Plaintiff also alleges common law trademark infringement and violations of the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/2(a), and The Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 505/2. The Court has supplemental jurisdiction for the state law claims pursuant to 28 U.S.C. §1367(a).

In March 2014, Plaintiff resumed his SwagAir Showcase activities and on March 30, 2014, and March 29, 2015, hosted his third and fourth showcases. These showcases, like the two that preceded them, were Chicago area events that hosted approximately 100 player-participants. However, Plaintiff does not state that he has sold any merchandise at the two most recent showcases.

## II. DISCUSSION

### A. Standard of Decision

"Summary judgment is appropriate if there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law." Dunderdale v. United Airlines, Inc., 807 F.3d 849, 853 (7th Cir. 2015) (citing Fed. R. Civ. P. 56(a)); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Wells v. Coker, 707 F.3d 756, 760 (7th Cir. 2013) (internal quotation marks and citation omitted). The Court views the evidence, and may draw all reasonable inferences, in the light most favorable to the nonmoving party. Id. The Court does not "assess the credibility of witnesses, choose between

competing reasonable inferences, or balance the relative weight of conflicting evidence." Stokes v. Bd. of Educ. of the City of Chi., 599 F.3d 617, 619 (7th Cir. 2010).

But before the nonmoving party "can benefit from a favorable view of evidence, he must first actually place evidence before the courts." Montgomery v. Am. Airlines, Inc., 626 F.3d 382, 389 (7th Cir. 2010). Simply showing that there is "some metaphysical doubt as to the material facts" will not defeat a motion for summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citations omitted); see also Argyropoulos v. City of Alton, 539 F.3d 724, 732 (7th Cir. 2008). And "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Summary judgment is appropriate if the nonmoving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Majors v. Gen. Elec. Co., 714 F.3d 527, 532 (7th Cir. 2013) (quoting Celotex Corp., 477 U.S. at 322).

**B. Trademark Infringement Under 11 U.S.C. § 1125(a)**

In order to prevail under 15 U.S.C. § 1125(a), a plaintiff "must demonstrate that (1) [his] mark is protectable and (2) the defendants' use of the mark is likely to cause confusion among consumers." Anago Franchising, Inc. v. IMTN, Inc., 477 F. App'x 383, 385 (7th Cir. 2012); see also Packman v. Chicago Tribune Co., 267 F.3d 628, 638 (7th Cir. 2001). Before examining whether the mark is protectable the Court first turns to the likelihood of confusion.

  1.  *Likely to Cause Confusion.*

Plaintiff alleges that the appearance of Nike's t-shirt bearing the words "SWAG AIR" is likely to result in—if it has not already—reverse confusion, and that such confusion will devalue his mark. Reverse confusion occurs when a "*senior user's* products are mistaken as originating

4

from (or being affiliated with or sponsored by) the *junior user*."[2] Fortres Grand Corp. v. Warner Bros. Entm't Inc., 763 F.3d 696, 701 (7th Cir. 2014) (emphasis in original). "The harm from this kind of confusion is that the senior user loses the value of the trademark—its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets." Id. (internal citations and quotations omitted). Here, Plaintiff is the senior user because he began using his "SwagAir" mark in March 2010, while Defendants did not begin until three years later in March 2013.

To determine if allegations of confusion are plausible the Seventh Circuit has employed a seven-factor test. The test examines:

> (1) the similarity between the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) any evidence of actual confusion; and (7) the intent of the defendant to 'palm off' his product as that of another.

Sorensen v. WD-40 Co., 792 F.3d 712, 726 (7th Cir. 2015) cert. denied, No. 15-473, 2016 WL 100387 (U.S. Jan. 11, 2016). Consumer confusion is ultimately a question of fact, but can be resolved on summary judgment "'if the evidence is so one-sided that there can be no doubt about how the question should be answered.'" Packman, 267 F.3d at 637 (quoting Door Sys., Inc. v. Pro–Line Door Systems, Inc., 83 F.3d 169, 171 (7th Cir.1996)); see also Sorensen, 792 F.3d at 726 (affirming the district court's ruling on summary judgment that no reasonable jury could find a likelihood of confusion).

      *a.)*     *Degree of Similarity between the Marks in Appearance.*

In evaluating the appearance of the marks, the Court must take the marks in the broader context, examining not only their appearance but "in light of what happens in the marketplace[.]"

---

[2] A *senior user* is the party who first made use of a mark, here, Plaintiff. Whereas a *junior* user is the subsequent party to use a mark.

5

Sorensen, 792 F.3d at 726. "'The court should therefore consider whether the customer would believe that the trademark owner sponsored, endorsed, or was otherwise affiliated with the product.'" Sorensen, 792 F.3d at 726-727 (quoting AutoZone, Inc. v. Strick, 543 F.3d 923, 930 (7th Cir. 2008). Furthermore, The Seventh Circuit has previously stated that "the prominent display of a well-known trademark—such as WD–40's shield [or the Nike swoosh]—along with an allegedly infringing mark is a strong indication that there is no likelihood of confusion." Sorensen, 792 F.3d at 727.

Here, both Plaintiff's shirt (pictured below on the left), and Nike's shirt (on the right) are t-shirts, available in a number of colors, and feature the words "swag" and "air." There are no other similarities.



Plaintiff's shirt features a silhouette of a male with "swagair.com" stylized and across his chest. To the right of the figure are the words "Daniel Poneman's SwagAir Showcase" across two lines, and immediately below the silhouette are the words "A DP B-ball Production" in quotation marks. In contrast Nike's shirt features the word "SWAG" immediately above the word "AIR" both of these words are placed above the Nike name and iconic "swoosh" logo. As is evident by examining the shirts, Defendants' shirt clearly and prominently displays the Nike name and logo.

6

Furthermore, Defendants' shirts were sold at brick-and-mortar retail outlets as well as online through various web portals; whereas Plaintiff's shirts were only available for purchase online in conjunction with registration for one of Plaintiff's first two showcases or in person at one of the two showcases held in 2010 or 2011. No reasonable jury could find that a consumer would wander into one of Defendants' stores and assume that Defendants were responsible for sponsoring the showcases that took place almost two years before the first Nike "SWAG AIR" shirt was ever sold.

As a result, it is unlikely that any consumer would be confused by the suggestion that the Plaintiff's activities were sponsored by or originated from Defendants. After examining the t-shirts, the Court rejects Plaintiff's assertions that "the marks are essentially identical[.]" Pl.'s Mem. Opp'n to Mot. Summ. J. 21. The Court finds there is a clear distinction between the appearances of the two marks.

### b.) *Similarity of the Products for Which the Name is Used.*

In determining the similarity of the products, courts consider "whether the parties' products are the kind the public might very well attribute to a single source[.]" AutoZone, Inc. v. Strick, 543 F.3d 923, 931 (7th Cir. 2008) (internal citations and quotations omitted). Therefore, confusion could exist if the products sold, or services offered, are of the type consumers would expect to come from Plaintiff.

Plaintiff primarily is a talent scout and sports promoter. His business thus far has been the scouting and promotion of high school basketball players through his social media activities. Defendants, on the other hand, are: Nike, a manufacturer of sporting goods and apparel, including but not limited to: shoes, t-shirts, shorts, golf clubs, backpacks, and sunglasses; and, Foot Locker, a retailer that sells athletic apparel, especially shoes. Because Plaintiff had not entered the apparel marketplace at the time of bringing this suit, nor has he made any subsequent attempt to enter the

7

clothing industry, the Court limits the analysis to the areas of his business, that is to say scouting and sports promotion.

Plaintiff alleges that but for Nike's egregious use of his mark, he would have already launched an apparel line focused around his "SwagAir" mark. However, "an unregistered *plan* to use a mark creates no rights." Zazu Designs, 979 F.2d at 504 (emphasis in original). Without registering his trademark, which Plaintiff has not, he must "win the race to the marketplace to establish the exclusive right to a mark." Id. at 503. Plaintiff's brief foray into apparel design and production was limited to the sale of 296 t-shirts at his 2010 and 2011 showcases. Since then Plaintiff has neither sold any t-shirts nor engaged in any activity that would give rise to trademark protection for his "SwagAir" mark on apparel.

No reasonable jury could find that a consumer would confuse Plaintiff's activities, which are mainly promotional, with Defendants, which are apparel sales and manufacturing. The Court finds that the services provided by Plaintiff are so disparate from the goods sold by Defendants that they would not be related in the minds of consumers.

        c.) *The Area and Manner of Use.*

When evaluating the area and manner of concurrent use the Court must consider "whether there is a relationship in use, promotion, distribution or sales between the goods or services of the parties. [And] whether the parties use the same channels of commerce, target the same general audience, or use similar marketing procedures." Sorensen, 792 F.3d at 730 (citing CAE, Inc. v. Clean Air Engineering, Inc., 267 F.3d 660, 681-682 (7th Cir.2001)).

This factor weighs heavily in favor of Defendants. Plaintiff provides scouting *services* and therefore the use of his service is not similar in scope to the use of Defendants' *products*. The channels of distribution are also wildly different. Defendants distribute their goods, en mass, through conventional brick-and-mortar stores and online retailers to the global community,

8

whereas Plaintiff's services are provided on an ad hoc basis to individual players and coaches. Plaintiff provided no evidence that his shirts were ever distributed in stores or that they could be purchased individually through his website. The t-shirts distributed in conjunction with Plaintiff's were distributed through very limited and informal channels and the t-shirts bearing the Plaintiff's mark were only available to registrants of the first two showcases and to those in attendance at the time.

Furthermore, when considering the parties target audiences the contrast becomes even clearer. Plaintiff provided his services to a select group of professionals, collegiate basketball coaches, while Defendants' provided their products to the public at large. Though there is some evidence that the target audience of both Plaintiff and Defendants overlapped – both targeted high school basketball players and college coaches – this overlap is de minimis when taken as part of the Defendants' audience. And although all parties use social media to advertise their businesses and connect with their consumers, Plaintiff marketed solely within these channels, while Defendants' used social media, traditional print media, television, radio, billboard advertisements, and paid for endorsements from well-known professional athletes such as Michael Jordan, LeBron James, Derek Jeter, and Tiger Woods. Plaintiff has produced no evidence that would allow a reasonable jury to conclude that the parties operated in the same area and manner of commerce.

### d.) *The Degree of Care Likely to be Exercised by Consumers.*

Here the Court must consider what degree of care Plaintiff's customers would exercise when searching for Plaintiff's services. See Sorensen, 792 F.3d at 730. Plaintiff avers that he has had an excellent reputation since he waded into the field. However, because the services Plaintiff provides are so different from the apparel Defendants provide, the Court cannot infer that this factor would ever become an issue of contention. Moreover, Plaintiff has provided no statements

9

from customers, explaining the care they took when shopping for his services, so as to support a finding of confusion based on this prong of the test.

In Sorensen, the Seventh Circuit considered whether customers seeking to purchase the lesser known senior product were instead misled into buying a better known junior user's brand. Here, the Court looks to the Plaintiff's customers. Plaintiff's products and services are limited to the field of scouting and sports promotion. Because he provides a specialized service to a small number of individuals a jury could reasonably infer that his customers would exercise a high degree of care when shopping for his representation. The sale of his "SwagAir" t-shirts was not part of his core business and was promotional in nature. Plaintiff distributed his t-shirts to registrants of his first two showcases, Plaintiff has provided no other evidence as to the sale of his t-shirts individually, or that there was or is a demand for his apparel. On the other hand, Defendants sold their t-shirts for between $18.00 and $28.00 to consumers who were discerning about their patronage of Defendants. No reasonable jury could find that a customer wanting to retain scouting or promotional services would be misled to buy a Nike t-shirt instead.

While Plaintiff's customers would have exercised a high degree of care when shopping for sports promotional services, the Court cannot infer that they would be misled by Defendants' use of "SWAG AIR."

    *e.)*  *The Strength of Plaintiff's Mark.*

"The stronger the mark, the more likely it is that encroachment on it will produce confusion. A mark's strength ordinarily corresponds to its economic and marketing strength." Sorensen, 792 F.3d at 731 (internal citations and quotations omitted). The Court now looks to the economic strength of the mark and the prevalence of any marketing campaigns for support as to the strength of the mark.

The "SwagAir" mark is only afforded trademark protection in areas it has established a reputation, see 15 U.S.C. 1115(b)(5), and as noted above, the area pertinent to this inquiry is apparel. The first time the "SwagAir" mark appeared on any apparel was in March 2010; it was featured on 150 t-shirts that were distributed in conjunction with the Plaintiff's showcase. Plaintiff spent approximately $1,500.00 on the shirts for the 2010 showcase. The price of the t-shirts was included in the $75.00 registration fee for showcase player-participants. Some of these t-shirts were also sold to attendees, but the record is unclear as to how many shirts were sold individually.

Altogether the Plaintiff distributed t-shirts at two showcases in 2010 and 2011 and sold 296 shirts. The gross receipt from both events was approximately $15,000.00. The record is silent as to what portion of that revenue is from the sale of t-shirts and what percentage of the income was profit. Looking past the results of these two showcases and examining the performance of Plaintiff's company as a whole, the Court finds that DP-Bball, LLC, was not economically strong. By Plaintiff's own admissions, it would not have been cost effective to register the term "SwagAir" with the United States Patent and Trademark Office, and moreover, the company as a whole was not profitable and therefore was allowed to dissolve.

Turning to the marketing strength of Plaintiff's mark. The Plaintiff's mark, as it applies to the t-shirts, has practically zero marketing exposure. Plaintiff utilized social media in order to spread awareness of his brand and services; however, there is no evidence in the record to suggest that Plaintiff ever marketed his t-shirts directly to the general public. Plaintiff made use of Twitter and YouTube to promote his services as a scout and promoter, while his showcases were promoted via social media, his t-shirts were not. Even making all inferences in favor of the Plaintiff the Court does not have sufficient evidence to support a finding of a strong mark based on Plaintiff's economic or marketing strength.

Given the limited evidence concerning the marketing strength of the Plaintiff's "SwagAir" mark, and the economic weakness of both the mark and Plaintiff's company, no reasonable jury could conclude that the mark is well known.

### f.) *Evidence of Actual Confusion.*

While evidence of actual confusion is not necessary to find for the Plaintiff, it does weigh heavily in favor of a finding of confusion. See Sorensen, 792 F.3d at 731. Here, Plaintiff provided several statements from friends and family members acknowledging Defendants' shirts bore the same words as Plaintiff's mark.

Plaintiff cites case law to establish that any instance of confusion is sufficient to establish actual confusion and that such confusion would weigh heavily in favor of Plaintiff. See Pl.'s Mem. Opp'n to Mot. Summ. J. 18. However, Plaintiff has provided no evidentiary support from actual customers to allow the Court to find an instance of actual confusion. While there were several statements made on Twitter, following the introduction of Nike's "SWAG AIR" shirts, from Plaintiff's fans and followers, Plaintiff admits that these statements were not indicative of actual confusion. Moreover, these tweets are inadmissible hearsay and cannot be considered by the Court absent deposition testimony or sworn affidavits from the declarants. See Fed. R. Evid. 801(c). Again, while the Plaintiff is entitled to a favorable view of the evidence, he must first place that evidence before the Court. Ultimately, there is no evidence of actual confusion before the Court and therefore no reasonable jury could find any instances of actual confusion and the Court finds this factor in favor of Defendants.

### g.) *Defendants' Intent to Palm off their Products as Those of Plaintiff.*

"In some circumstances, an intent to confuse may be reasonably inferred from the similarity of the marks where the senior mark has attained great notoriety." AutoZone, 543 F.3d at 934. Plaintiff provides no evidence to support a finding in his favor for this prong of the analysis,

nor does he argue that Defendant Nike intended to "[p]alm off" their products as his. Pl.'s Mem. Opp'n to Mot. Summ. J. 21. Instead, Nike personnel have testified as to the trademark and internet searches conducted before releasing their "SWAG AIR" t-shirt. These searches turned up no prior use of "SwagAir" in a commercial context. Moreover, in Plaintiff's memorandum, he concedes that "Defendants are more well-known entities and it is unlikely [Defendants] tried to palm off their goods . . ." Pl.'s Mem. Opp'n to Mot. Summ. J. 21.

Notwithstanding this concession, however, "[i]n a reverse confusion case, of course, the defendant by definition is *not* palming off or otherwise attempting to create confusion as to the source of his product. Thus, the 'intent' factor of the likelihood of confusion analysis is essentially irrelevant in a reverse confusion case." Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947, 961 (7th Cir. 1992). Accordingly, this factor weighs in neither party's favor.

The Court has weighed the several factors articulated by the Seventh Circuit and finds that the overwhelming weight of support is for the Defendants. The three most important factors, the similarity of the marks, the defendant's intent to "palm off" their products, and actual confusion, see Packman 267 F.3d at 643, all weigh in favor of Defendants, no reasonable jury could find that consumers would be confused by Plaintiff's and Nike's products. Moreover, the remaining factors also favor Defendants. Accordingly, summary judgment in favor of Defendants is appropriate.

2.) *A Protectable Mark.*

Because the Court finds that no reasonable jury could find that there is a likelihood of confusion, the Court declines to address the second component of Plaintiff's trademark claim.

**C.   Supplemental Jurisdiction Under 28 U.S.C. 1367(a)**

Turning now to the common law and state law claims. Plaintiff brings three distinct claims under Illinois law for alleged infringement on his mark. First is common law trademark infringement, then a claim under the Illinois Uniform Deceptive Trade Practices Act, and the

13

Illinois Consumer Fraud and Deceptive Trade Practices Act. Turning first to the common law claim.

"To prevail on a [common law] claim of trademark infringement, the plaintiff must show: (1) it has a protectible [sic] ownership interest in the mark; and (2) the defendant's use of the mark is likely to cause consumer confusion, infringing on the plaintiff's rights to the mark. Jim Mullen Charitable Found. v. World Ability Fed'n, NFP, 917 N.E.2d 1098, 1104 (Ill. 2009). The elements of a claim for common law trademark infringement are the same as under 15 U.S.C. § 1125(a). Because the Court has already addressed, at length, how Plaintiff fails to satisfy the likelihood of confusion element, there is no reason to rehash the same discussion. Judgment for Defendants is granted as to Count II.

Turning to the Illinois Deceptive Trade Practices Act claim, the statute requires that the offending mark, here the Defendants' use of "SWAG AIR[,]" "causes [a] likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services[.]" 815 Ill. Comp. Stat. 510/2. Because this confusion analysis was necessary for the federal claim the Court refers to the above discussion and grants judgment for the Defendants as to Count III.

Finally, the Court turns to Plaintiff's Count IV. "[T]o prevail on an [Illinois Consumer Fraud and Deceptive Business Practices Act] claim. The plaintiff must prove that (1) the defendant committed a deceptive act or practice; (2) the defendant intended for the plaintiff to rely on the deception; (3) the deception happened in the course of trade or commerce; and (4) the deception proximately caused the plaintiff's injury." Cocroft v. HSBC Bank USA, N.A., 796 F.3d 680, 687 (7th Cir. 2015). Because the analysis required to evaluate Plaintiff's consumer fraud claim does not share any common elements with his federal claim, the Court declines to exercise

supplemental jurisdiction over the last state claim. Accordingly, Plaintiff's fourth claim is dismissed without prejudice. See Groce v. Eli Lilly & Co., 193 F.3d 496, 501 (7th Cir. 1999).

### III. CONCLUSION

For the foregoing reasons, summary judgment is granted in favor of Defendants for the Trademark Infringement claim. Summary Judgment is also granted in favor of the Defendants for the common law trademark infringement claim and the Illinois Uniform Deceptive Trade Practices claim. The remaining state law claim is dismissed.

IT IS SO ORDERED.

ENTER:

_____
CHARLES RONALD NORGLE, Judge
United States District Court

DATE: February 9, 2016